UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS F. JORDAN,<br><br>           Petitioner,<br><br>v.<br><br>MICHAEL RODRIGUEZ,<br><br>           Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 19-cv-12022-DJC<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                       **April 28, 2022**

## I.   Introduction

Petitioner Dennis F. Jordan ("Jordan") has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition"). D. 1. Respondent Michael Rodriguez, the Superintendent of MCI-Concord, opposes the Petition. D. 18. For the reasons discussed below, the Court DENIES the Petition.

## II.   Standard of Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts may only grant habeas petitions involving claims adjudicated in state court that have resulted in a decision that was either "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As an initial matter, a petitioner must show that he has exhausted all state court remedies or, in the alternative, that the

1

state did not offer appropriate corrective measures. Id. § 2254(b)(1). To prove exhaustion, a petitioner must demonstrate that he has "fairly and recognizably" presented his claim to the state's highest court, the Supreme Judicial Court in this case. Casella v. Clemons, 207 F.3d 18, 20 (1st Cir. 2000); Adelson v. DiPaola, 131 F.3d 259, 263 (1st Cir. 1997).

For the purposes of 28 U.S.C. § 2254(d)(1), federal law is defined as Supreme Court holdings and excludes dicta. White v. Woodall, 572 U.S. 415, 419 (2014) (internal citation omitted). "[A]n unreasonable application of federal law" is not the same as "an incorrect application of federal law." Scott v. Gelb, 810 F.3d 94, 101 (1st Cir. 2016) (emphasis in original) (quoting Harrington v. Richter, 562 U.S. 86, 101 (2011)). Not even clear error will establish an objectively unreasonable conclusion. White, 572 U.S. at 419. Habeas relief is not warranted if "'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

For the purposes of § 2254(d)(2), any factual determinations made by a state court are "presumed to be correct" unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing § 2254(d)(2)).

### III. Relevant Factual and Procedural Background

Unless otherwise noted, this factual background is drawn from the Massachusetts Appeals Court's decision affirming Jordan's conviction. Commonwealth v. Jordan, No. 17-P-13, 93 Mass. App. Ct. 1106, 2018 WL 1770243, at *1 (Mass. App. Ct. Apr. 13, 2018) (unpublished opinion).

A.   **Offense Conduct**

The charges against Jordan arose out of events that occurred on the night of September 13, 2002 and into the early morning hours of September 14, 2002. Id. at *1. On the night of September 13, 2002, the driver of a private bus, Jerial Wilson ("Wilson"), drove Jordan and six male friends to a party in Brockton, Massachusetts. Id.; Commonwealth v. Jordan, Mass. Sup. Ct., No. 0283CR637 (Aug. 22, 2016); D. 1-1 at 2. Wilson, whom Jordan knew personally, stayed on the bus while the group stood in line to enter the party. Jordan, 2018 WL 1770243 at *1 & n.2. At some point, a security guard removed Jordan from the line and a fight ensued in which Jordan and another man from his group fired gunshots. Id. at *1. Three security guards, including Nawarrior Lewis ("Lewis"), were shot. Id. After the shooting, Jordan returned to the bus and banged on the door to be let in. Id. From inside the bus, Wilson could see that Jordan was holding a black handgun. Id. Jordan and the other men in his group boarded the bus and Wilson drove away at Jordan's instruction. Id.

Stoughton police arrested Jordan on October 11, 2002. Id. At the police station, officers informed Jordan of his Miranda rights and he invoked his right to remain silent at around 4:40 p.m. Id. at *1, *5. Thereafter, Brockton police, including Detective Dominic Persampieri ("Persampieri"), arrived to transport Jordan to the Brockton police station. Id. at *1. Jordan became agitated and stated to Persampieri, "'[y]ou ain't got nothing on me, you can't prove nothing,' and '[w]itnesses seem to not want to testify.'" Id. at *4. Persampieri responded, "[w]e may be charging you federally." Id. Jordan then replied, "[y]ou ain't got the gun." Id. Once at the Brockton police station, officers booked Jordan and again advised him of his Miranda rights. Id. at *1. Jordan declined to speak with Persampieri, instead asking to speak with Detective Ernest Bell ("Bell"), who was off duty that day. Id. at *1, *5. Bell eventually arrived at the station to

3

interview Jordan. Id. at *1. Prior to questioning, Bell advised Jordan of his Miranda rights for a third time. Id. at *5. The interview lasted approximately one hour. Id. at *1. During the interview with Bell, Jordan described the shooting, leaving the scene in a car with a woman named Star and finding the guns that were used in the shooting. Id. at *6.

### B. Relevant State Court Proceedings

Jordan was charged with armed assault with intent to murder, assault and battery by means of a dangerous weapon, unlawful possession of a firearm as an armed career criminal. Id. at *1. A jury convicted Jordan on all counts in 2005, but when several volumes of transcripts could not be produced for appellate review, the trial court ordered a new trial, which is the subject of this Petition. Id. at *2 & n.3.

Before the second trial in 2013, Jordan filed motions to suppress the statements he made to Persampieri and Bell after his arrest, all of which the trial court denied. Id. at *2; D. 1 at 2. Wilson testified for the government, including that he had participated in unspecified federal investigations that did not relate to this case. Jordan, 2018 WL 1770243, at *2. Jordan sought to show that Wilson was biased against him because of Jordan's alleged involvement in the murder of Wilson's brother, id., but the court limited Jordan's cross-examination of Wilson to questions about his role as a paid federal informant and did not permit Jordan to question Wilson about the details of the federal investigations, D. 1-1 at 8. Lewis also testified, stating that he saw Jordan and two other men from Jordan's group outside the club and that he saw Jordan fire a gun. Id. at 10–11. Another security guard also identified Jordan as the gunman. Jordan, 2018 WL 1770243, at *1, *3. The Commonwealth introduced ballistic evidence, as well as "[Jordan]'s own incriminating and inconsistent statements," to corroborate the witness testimony connecting Jordan to the shooting. Id. at *3.

4

At the conclusion of the trial, Jordan's counsel did not request a jury instruction on mistaken eyewitness identification as to Lewis' testimony. Id. The second jury convicted Jordan on all counts. Id. at *2; D. 1 at 2. The trial court sentenced him to eighteen to twenty years' imprisonment. D. 1 at 2. Jordan moved for a new trial, which the trial court denied. On April 13, 2018, the Appeals Court affirmed Jordan's conviction and the denial of his motion for new trial. Jordan, 2018 WL 1770243, at *1. Jordan appealed to the Supreme Judicial Court, which denied further review on June 29, 2018. D. 1 at 3.

    C.    **This Petition**

Jordan then filed this Petition, seeking 28 U.S.C. § 2254 habeas relief on the grounds that: (1) the trial court's restriction on the cross-examination of Wilson regarding his alleged bias and the government's withholding of evidence regarding same violated Jordan's due process, confrontation and fair trial rights under the Fourteenth and Sixth Amendments ("Ground I"); (2) his counsel's failure to request a jury instruction on mistaken eyewitness identification violated Jordan's Sixth Amendment right to effective assistance of counsel ("Ground II") and; (3) the trial court erred in denying Jordan's motion to suppress statements Jordan made to police detectives in violation of his Fifth Amendment right to remain silent ("Ground III"). Id. at 9–12.

**IV.**    **Discussion**

    A.    **Witness Bias (Ground I)**

        1.    *Confrontation Clause*

Jordan asserts that the trial court's restriction on cross-examination of Wilson regarding Wilson's alleged bias against Jordan violated his Sixth Amendment right to confront the witnesses testifying against him. D. 1 at 9. The Appeals Court found that limiting cross-examination was reasonable because the record lacked a sufficient factual basis to link Jordan to the murder of Wilson's brother. Jordan, 2018 WL 1770243, at *2. "The partiality of a witness is subject to

5

exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." Davis v. Alaska, 415 U.S. 308, 316 (1974) (citation and internal quotation marks omitted). The right to confront a witness regarding bias, however, is not limitless. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Indeed, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id.; United States v. Twomey, 806 F.2d 1136, 1139–40 (1st Cir. 1986) (concluding that trial judge's limitation of cross examination was not an abuse of discretion where defendant did not produce sufficient evidence to support inquiry of the topic on cross-examination). Courts apply a two-prong test for Confrontation Clause violations which considers whether: (1) the limitation of cross-examination prejudiced the examination of the witness and (2) the error was harmless beyond a reasonable doubt. Van Arsdall, 475 U.S. at 679–81.

        a)       Prejudice

Where a defendant's inquiry as to bias is restricted, prejudice results if "[a] reasonable jury might have received a significantly different impression of [the witness]'s credibility" had the court allowed the defendant to pursue his line of inquiry on cross-examination. Id. at 680. In Davis, the Court held that precluding the defendant from cross-examining the government's key identifying witness about his probation status prejudiced the defendant because without such questioning, the defendant could not call to the jury's attention the witness' motivation for testifying. Davis, 415 U.S. at 317–18. Similarly, in Van Arsdall, the Supreme Court found prejudice where the trial court barred all inquiry into the witness' bias and motivation for testifying, including the witness' agreement to cooperate with the government in exchange for the

6

government dismissing an unrelated criminal charge against him. Van Arsdall, 475 U.S. at 676, 679–80. By contrast, in Twomey, the First Circuit found no prejudice where the district court barred inquiry into the witness' alleged involvement in an unrelated murder because the defense did not present adequate evidence connecting the witness to the murders and the defendant thoroughly cross-examined the witness regarding his deal with the government to testify in exchange for the government recommending a favorable sentence. Twomey, 806 F.2d at 1139–40.

      Here, the state court's limitation on the cross-examination of Wilson did not prejudice Jordan. Jordan posited that his alleged involvement in the murder of Wilson's brother led Wilson to work as an informant for the government and to target Jordan's associates in unrelated criminal investigations. Jordan, 2018 WL 1770243, at *2. Jordan also theorized that Wilson's trial testimony was biased against Jordan because of Jordan's purported involvement in the brother's murder. Id. The record, however, provided no basis to connect Jordan or his targeted associates to the brother's death. Id. Jordan's counsel was permitted to elicit that Wilson was a government informant and argued that the relationship undermined Wilson's credibility as an impartial witness. D. 1-1 at 8. The court excluded questions to Wilson about the details of the unrelated federal investigations "because the details had no probative value on the issue of bias and would tend to waste time and confuse the jury with details of investigations that did not involve [Jordan]." Id. Like Twomey, the judge found that Jordan provided insufficient evidence to allow further inquiry into the specific targets of the federal investigations. Jordan, 2018 WL 1770243, at *2; see Twomey, 806 F.2d at 1139–40. Unlike in Van Arsdall, the trial court here did not prohibit all cross-examination into Wilson's bias, see Van Arsdall, 475 U.S. at 676, and allowed the jury to hear about his relationship with the government that might lead to bias, Jordan, 2018 WL 1770243,

at *2.  Therefore, the state court's limitation on cross-examination did not prejudice Jordan. Accordingly, the state court did not abuse its discretion in limiting Jordan's cross-examination and did not violate Jordan's Sixth Amendment right to confront Wilson.

### b) Harmless Error

Even assuming *arguendo* that the court's restriction on cross-examination was error, Jordan's claim nevertheless fails the second prong because any error by the state court was harmless beyond a reasonable doubt.  An "error is harmless when 'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Mitchell v. Esparza, 540 U.S. 12, 17–18 (2003) (quoting Neder v. United States, 527 U.S. 1, 15 (1999)).  When determining whether an error caused harm, courts consider "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Van Arsdall, 475 U.S. at 684 (citation omitted).

In the present matter, Wilson was not the only witness offered against Jordan.  Lewis and another security guard identified Jordan as a shooter, the prosecution presented ballistic evidence linking Jordan to the crime, and Jordan himself made incriminating statements to police. Jordan, 2018 WL 1770243, at *1, *3–4.[1]  Moreover, Wilson was not a percipient witness, as he did not personally see the crime occur. Id. at *1, *3.  Accordingly, the trial court did not violate the confrontation clause by limiting Jordan's cross examination of Wilson.

---

[1] As discussed below, the Court finds no error in the trial court's admission of Jordan's statements to police.

2. *Due Process*

Jordan asserts that the government withheld requested evidence related to Jordan's claim that Wilson was biased against him. D. 1 at 9. Such withholding, Jordan argues, violated his due process rights. Id. Due process requires the government to disclose exculpatory and impeachment evidence in its possession that is material. United States v. Bagley, 473 U.S. 667, 669 (1985) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)). "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial" and "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 678, 682; see Kyles v. Whitley, 514 U.S. 419, 432–36 (1995).

Jordan has not shown that the evidence he sought about the federal investigations in which Wilson cooperated was material. That is, the jury was sufficiently aware of Wilson's potential bias and there is no reasonable probability that a different outcome would have occurred if the prosecution had disclosed this additional evidence about the targets in unrelated crimes. See Twomey, 806 F.2d at 1139–40 (noting that the jury heard thorough cross-examination of the witness that "clearly established that the government recommended a favorable sentence for him in return for his agreement to identify and then testify against the [petitioner]" and that the jury was adequately able to decide whether this motivated the witness to testify in favor of the government). Accordingly, Ground I of the Petition fails.

B. **Ineffective Assistance of Counsel (Ground II)**

Jordan argues that trial counsel's failure to request a jury instruction regarding Lewis's eyewitness identification violated his Sixth Amendment right to effective assistance of counsel. D. 1 at 11; D. 3 at 45–55. The Sixth Amendment "right to counsel is the right to effective

assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). To establish ineffective assistance of counsel, Jordan must demonstrate that his "(1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." United States v. Constant, 814 F.3d 570, 578 (1st Cir. 2016) (quoting Strickland, 466 U.S. at 688, 694) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The legal standards created by Strickland and § 2254 are "highly deferential, . . . and when the two apply in tandem, review is doubly so." Richter, 562 U.S. at 105 (internal citations and quotation marks omitted).

As to the first Strickland prong, deficiency will only be found where "counsel's choice was so patently unreasonable that no competent attorney would have made it." Williams v. United States, 858 F.3d 708, 715 (1st Cir. 2017) (quoting Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006)); Strickland, 466 U.S. at 688. Courts assess reasonableness "as of the time of counsel's conduct." Strickland, 466 U.S. at 690. Here, the Appeals Court declined to address this prong in its analysis, since Jordan's showing fails on the second Strickland prong. Jordan, 2018 WL 1770243, at *3 (applying Commonwealth v. Saferian, 366 Mass. 89, 96 (1974)[2]). This Court does the same.

Even assuming *arguendo* counsel made a professionally unreasonable error, the judgment of a criminal proceeding will not be set aside if that error did not adversely affect the defense. Strickland, 466 U.S. at 693. The Supreme Court has found that an unrequested jury instruction

---

[2] "[F]or habeas purposes, Saferian is a functional equivalent of Strickland." Ouber v. Guarino, 293 F.3d 19, 32 (1st Cir. 2002).

10

"was not reasonably likely" to have impacted the outcome of the trial where there was "ample evidence" of the defendant's guilt and the jury was instructed to assess the credibility of the prosecution's witness. Berghuis v. Thompkins, 560 U.S. 370, 390–91 (2010) (crediting substantial evidence of guilt, including the victim's identification of the defendant of as the shooter, which was supported by a surveillance photo, and testimony from another witness that the defendant confessed, which was corroborated by physical evidence).

Here, the Appeals Court concluded that Jordan failed to demonstrate that he was prejudiced because the instructions on witness testimony were sufficient to alert the jury to the possibility of honest but mistaken eyewitness identification as it instructed them to consider, among other things, "the witness's frankness or evasiveness," the reasonableness of the testimony," "the opportunity that the witness had to observe what it is they're telling you," and "the accuracy of the witness's memory." Jordan, 2018 WL 1770243, at *3 and cases cited. Moreover, Lewis's testimony was neither the only inculpatory evidence nor the most important evidence implicating Jordan. Id. Multiple witnesses connected Jordan to the crime, the Commonwealth submitted ballistic evidence and Jordan's own incriminating statements provided substantial evidence of guilt. Id. at *3–4. This evidence, together with the jury charge, did not persuade the Appeals Court that an additional jury instruction would have influenced the verdict such that Jordan was prejudiced by the omission. Id.

This Court agrees. The Commonwealth's case did not rely solely on Lewis' identification; there was substantial other evidence of Jordan's guilt such that any error did not prejudice Jordan. Id. (citing to other witnesses, ballistic evidence and Jordan's own statements to police linking Jordan to the crime). Jordan has failed to convince this Court that an additional jury instruction specific to honest but mistaken eyewitness identification would have changed the jury's verdict.

11

See Berghuis, 560 U.S. at 390–91 (finding that lack of jury instruction did not prejudice the defendant because there was strong evidence of guilt and the judge instructed the jury to weigh all the evidence, which included the credibility of the witness).  The Appeals Court's determination that Jordan's ineffective assistance of counsel claim failed was neither contrary to nor an unreasonable application of clearly established federal law.  Accordingly, Jordan's ineffective assistance of counsel claim, Ground II of the Petition, fails.

### C.  Denial of Motion to Suppress Statements (Ground III)

Jordan argues that the statements he made to police during his arrest violated the Fifth Amendment, and the trial court erred in denying his motion to suppress his statements to police. D. 1 at 12.  Under Miranda, an individual who is subject to "custodial interrogation" must first be told of his Fifth Amendment right against self-incrimination prior to any questioning.  Miranda v. Arizona, 384 U.S. 436, 444 (1966); see Johnston v. Mitchell, 871 F.3d 52, 57 (1st Cir. 2017).  An individual is entitled to Miranda protections once they are in police custody and subject to police interrogation.  Rivera v. Thompson, 879 F.3d 7, 14 (1st Cir. 2018) (citing Beckwith v. United States, 425 U.S. 341, 347 (1976)).[3]

"[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. 291, 294, 301–02 (1980) (footnotes omitted) (noting that "the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response"

---

[3] There is no dispute that Jordan was under arrest and thus in police custody when he made statements to both Persampieri and Bell, Jordan, 2018 WL 1770243, at *1, *4.

even where the defendant was under arrest at the time (emphasis in original) (footnote omitted)). In Innis, two police officers, while in the presence of the defendant, discussed amongst themselves the possibility of children getting hurt if they were to find the gun the officers suspected belonged to the defendant. Id. at 294–95. The Supreme Court concluded that even though the defendant then told the officers that he would show them where the gun was located, the officers' statements did not rise to the level of interrogation because they invited no response from the defendant. Id. at 295, 302–04.

    1.    *Statements to Persampieri*

Here, Jordan stated to Persampieri "[y]ou ain't got nothing on me, you can't prove nothing," "[w]itnesses seem to not want to testify" and then in response to the detective's comment that they might charge him federally, "[y]ou ain't got the gun." Jordan, 2018 WL 1770243, at *4. The Appeals Court concluded that Miranda did not apply to Jordan's statements to Persampieri because they were not given during an interrogation. Id. at *4. Under Miranda, Persampieri did not interrogate Jordan during their exchange at the Stoughton police station because Persampieri did not initiate the exchange and did not ask Jordan any questions. Id. (noting that no officer, including Persampieri, asked Jordan any questions prior to his statements, which Jordan made voluntarily). Nor was Persampieri's comment about possible federal charges, id., reasonably likely to elicit an incriminating response from Jordan because it was not a question inviting a reply, id.; see Innis 446 at 294–95, 301–04.

Moreover, instead of remaining silent, Jordan engaged in conduct that indicated he waived his right to remain silent by initiating a conversation with Persampieri. Jordan, 2018 WL 1770243, at *1, *4; Berghuis, 560 U.S. at 385–87. There is nothing in the record to indicate that Jordan did not understand his rights, as police gave multiple Miranda warnings and Jordan properly invoked

them. Jordan, 2018 WL 1770243, at *4-5. Nor was there any evidence that police coerced the statements out of Jordan since it appears from the record that Persampieri was not attempting to interrogate Jordan before Jordan made these statements. Id. at *4. It is reasonable to conclude, therefore, that Jordan knowingly and voluntarily made those statements to Persampieri and that such conduct indicated that he wished to waive his right to remain silent. See Berghuis, 560 U.S. at 385-87 (acting in a manner inconsistent with invocation of right to remain silent is a deliberate choice to relinquish that right). The statements to Persampieri were admissible because they were not the product of police interrogation in violation of Jordan's Fifth Amendment right. See id. The state court did not unreasonably deny Jordan's motion to suppress the statements.

    2.    *Statements to Bell*

During the later interview with Bell, Jordan described the shooting, leaving the scene in a car with a woman named Star and the guns used in the shooting. Jordan, 2018 WL 1770243, at *6. These statements to Bell were admissible and did not violate the Fifth Amendment. "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Michigan v. Mosley, 423 U.S. 96, 104 (1975) (internal citation omitted). Courts must look to the totality of the circumstances, and "[t]he key inquiry remains whether defendant 'was in charge of the decision whether and to whom he would speak.'" United States v. Lugo Guerrero, 524 F.3d 5, 12 (1st Cir. 2008) (quoting United States v. Thongsophaporn, 503 F.3d 51, 57 (1st Cir. 2007)). Factors assessed include: (1) whether the police immediately ceased all interrogation once the arrestee invoked his right to remain silent; (2) whether the amount of time elapsed between the invocation and the resumption of questioning was significant; (3) whether the police provided new Miranda warnings to the arrestee; and (4) whether the later interrogation covered the same subject

matter as the earlier interrogation.  Grant v. Warden, Maine State Prison, 616 F.3d 72, 77, 79 (1st Cir. 2010); Mosley, 423 U.S. at 104–06.

In Mosley, the Court determined that the defendant's right to cut off questioning was scrupulously honored where the defendant was interrogated a second time after invoking his right to remain silent because police immediately ceased questioning after invocation, more than two hours lapsed between the two interviews, the interviews were conducted by different detectives in different locations and concerned different crimes, and police gave renewed Miranda warnings prior to the second interrogation.  Mosley, 423 U.S. at 104–05.  Similarly, the First Circuit in Grant, affirmed the denial of habeas relief where both interviews concerned the same crime and were conducted by the same detective because police immediately ceased questioning after invocation, nineteen hours passed between the two interviews and police provided renewed Miranda warnings.  Grant, 616 F.3d at 77–80.

Here, the Appeals Court acknowledged that Bell was not present when Jordan invoked his right at the Stoughton police station or in front of Persampieri in Brockton, which weighs against suppressing the statements Jordan made to Bell.  Jordan, 2018 WL 1770243, at *5.  Although "there had been no interrogation on any subject prior to Detective Bell's interview," the court reasoned that because Bell questioned Jordan about only the crime for which he was arrested, that factor also weighs against admission.  Jordan, 2018 WL 1770243, at *5 (citation omitted); see Grant, 616 F.3d at 78.  On balance, the court concluded that Jordan's motion to suppress was properly denied because:  Persampieri did not question Jordan after he said he did not want to speak with Persampieri; more than three hours had elapsed from the time Jordan invoked his right to remain silent in Stoughton and the questioning by Bell; Jordan was repeatedly advised of his

15

Miranda rights, including immediately before the interview with Bell; and there was "little persistence by the police in wearing down the defendant." Id. at *5–6.

Jordan knowingly and voluntarily waived his right to remain silent when he asked to speak with Bell and failed to invoke his right to remain silent after Bell gave a renewed Miranda warning, choosing instead to proceed with the interview. Id. at *1, *5–6; see North Carolina v. Butler, 441 U.S. 369, 373 (1979). As discussed above, Jordan understood his rights, partook in conduct indicating waiver, and there is no evidence of coercion by the police. Jordan, 2018 WL 1770243, at *1, *5–6. More than three hours after his invocation of his right to remain silent—a "significant" gap—elapsed between Jordan's Miranda invocation in Stoughton and the interview by Bell. Id. at *5; see Mosley, 423 U.S. at 104–06 (finding an interval of more than two hours to be "a significant period of time"). Before the interview began, Bell gave Jordan his Miranda rights again. Jordan, 2018 WL 1770243, at *5. All of these facts weigh in favor of admission. See Mosley, 423 U.S. at 104–07; Grant, 616 F.3d at 77–78. A review of the totality of the circumstances leading to Jordan's statements to Bell reveals that Jordan's "'right to cut off questioning' was fully respected in this case" and thus, the statements to Bell were admissible. Mosley, 423 U.S. at 104; see Grant, 616 F.3d at 77–78. The Massachusetts Appeals Court's conclusion that the trial court did not err in denying Jordan's motion to suppress was not "an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). Accordingly, Ground III of the Petition also fails.

## V.     Conclusion and Certificate of Appealability

For the reasons stated above, the Court DENIES the Petition. D. 1.

A petitioner may receive a certificate of appealability only if he has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Such a showing is made

when "reasonable jurists would find the [state] court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Based upon its analysis of the record and the applicable law, this Court does not, at this time, conclude that "reasonable jurists could debate" this Court's conclusion. Id. at 483–84. Although the Court is not inclined to issue a certificate of appealability at this time, the Court will give Jordan until May 30, 2022 to file a motion for certificate of appealability addressing whether he seeks a certificate of appealability as to any of the grounds in the Petition and making the showing that such is warranted here.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge